# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SAMMIE ANDERSON; GRANT BIBLE;** | § | |
| **AND SAMUEL BIBLE,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 3:20-cv-00456** |
| **CITY OF DESOTO; OFFICER BRYAN** | § | |
| **SCOTT-LEE; OFFICER PATRICK** | § | |
| **KREKEL; OFFICER RYAN MONEY;** | § | **JURY TRIAL DEMANDED** |
| **OFFICER LARRY WALKER; OFFICER** | § | |
| **KENDALL MCGILL; AND OFFICER** | § | |
| **COURIE BRYANT** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiffs  SAMMIE ANDERSON, GRANT BIBLE, and SAMUEL BIBLE, ("Plaintiffs"), by and through his attorneys, brings this action for damages and other legal and equitable relief from Defendants CITY OF DESOTO; OFFICER BRYAN SCOTT-LEE; OFFICER PATRICK KREKEL; OFFICER RYAN MONEY; OFFICER LARRY WALKER; OFFICER KENDALL MCGILL; and OFFICER COURIE BRYANT (collectively "Defendants"), for violations of their rights under the United States Constitution, including the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 and any other cause(s) of action that can be inferred from the facts set forth herein.

## INTRODUCTION

1.      This is an action brought by Plaintiff seeking damages from Defendants for acts of racial profiling, unlawful detention, unlawful arrest, excessive force, and inadequate training, committed by members of the DeSoto Police Department as agents of Defendants or Defendants themselves.

2.      Plaintiffs allege that the City of DeSoto and the DeSoto Police Department, collectively referred herein as the "Policymakers," failed to properly supervise and/or discipline officers who are known, or who should have been known, to engage in the use of excessive force. The City of DeSoto and the DeSoto Police Department had a duty but failed to implement and/or enforce policies, practices, and procedures for the DeSoto Police Department that respected Plaintiffs' rights. As a consequence, DeSoto Police officers knew that the Policymakers would approve and/or ratify the violative actions that are the subject of this complaint. Chief Joe Costa of the DeSoto Police Department ratified the actions of Defendant Officers Bryan Scott-Lee, Patrick Krekel, Ryan Money, Larry Walker, Kendall McGill, and Courie Bryant by failing to implement the appropriate disciplinary measure of immediate termination of the officers. He also attempted to minimize their misconduct by publicly defending their actions, allowing them to remain as peace officers within the same department that violated Plaintiffs' rights, and defending the actions being complained of by Plaintiffs. For these civil rights violations and other causes of action discussed herein, Plaintiffs seek answers and compensation for damages.

3.      As a result of Defendants' unlawful actions, Plaintiffs are entitled to recover for damages pursuant to violations of their rights under the United States Constitution, including protections against unreasonable searches and seizures under the Fourth Amendment and right to equal protection under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress

2                                    ORIGINAL COMPLAINT

providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq*., as amended, and (iii) 42 U.S.C. §§ 1983 *et seq*., as amended.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

6.      Plaintiff Sammie Anderson is a person who has been aggrieved by Defendants' actions.  She has been, at all relevant times, an African-American citizen of the United States of America and a resident of the state of Texas.

7.      Plaintiff Grant Bible is a person who has been aggrieved by Defendants' actions. He has been, at all relevant times, an African-American citizen of the United States of America and a resident of the state of Texas.

8.      Plaintiff Samuel Bible is a person who has been aggrieved by Defendants' actions. He has been, at all relevant times, an African-American citizen of the United States of America and a resident of the state of Texas.

9.      Defendant City of DeSoto is located within the State of Texas and within the Northern District of Texas. Defendant City of DeSoto operates the DeSoto Police Department ("DeSoto PD").

10.     Officers Bryan Scott-Lee, Patrick Krekel, Ryan Money, Larry Walker, Kendall McGill, and Courie Bryant were each, at all times pertinent to this complaint, employed by the City of DeSoto as certified peace officers working in Dallas County, Texas and acting under color of state law.

**ORIGINAL COMPLAINT**

## STATEMENT OF FACTS

**I.      Defendants unlawfully detained Plaintiffs.**

11.      On August 7, 2018, Officers Bryan Scott-Lee, Patrick Krekel, Ryan Money, Larry Walker, Kendall McGill, and Courie Bryant unlawfully detained, arrested, and used excessive force against several individuals, including a mother, Sammie Anderson, her adult sons: Matt Bateman, Grant Bible, and Samuel Bible; and a family friend, Jayla Armstead.

12.      Sammie Anderson was volunteering to help a neighbor who is a senior citizen when she learned that two of her sons, Matt Bateman and Grant Bible, became involved in an argument.

13.      Although the argument did not become physical, family members were concerned that Matt Bateman was not acting like himself; so, Sammie Anderson  encouraged another family member to call the police, hoping officers would help calm the situation.

14.      Officer Bryan Scott-Lee was the first to arrive at the scene on or about 8:46 p.m.

15.      Video footage from a camera mounted in his vehicle (his "dash" camera), and his body camera footage, shows him arriving at a quiet scene.

16.      In statements to the *Dallas Morning News*, DeSoto PD's Chief, Joe Costa, confirmed this fact after viewing Officer Scott-Lee's dash camera footage, stating, "There was no physical altercation, no arguing . . . it was calm."

17.      Officer Patrick Krekel arrived at the scene seconds after Officer Scott-Lee.

18.      Sammie Anderson's street terminated in a dead end. As Officer Scott-Lee approached the dead end, he first encountered Sammie Anderson, Matt Bateman, and Grant Bible. Sammie Anderson and Matt Bateman were walking away from the dead end. Grant Bible was near the dead end, seated in his vehicle.

**ORIGINAL COMPLAINT**

19.     Officer Scott-Lee exited his vehicle, immediately drew his taser, and began ordering everyone to, "Get on the ground," despite the fact that he had no reason to suspect they had been involved in, were involved in, or were about to be involved in criminal activity or posed any threat to his safety.

20.     Officer Scott-Lee did not even know whether Sammie Anderson, Matt Bateman or Grant Bible were associated with the call he was responding to nor did Officer Krekel when he joined Officer Scott-Lee in ordering everyone to get on the ground at taser-point.

21.     Officers Scott-Lee and Krekel would later claim that they saw Sammie Anderson, Matt Bateman, and Grant Bible running from the house and fighting when they arrived, but Officer Scott-Lee's dash camera footage shows that this was not true.

22.     Plaintiffs allege the only fact Officers Scott-Lee and Krekel observed about Plaintiffs that led to them being detained and arrested was the fact that they were each African American.

23.     Matt Bateman put his hands in the air and laid down on the ground less than three seconds after first being commanded to do so.

24.     Matt Bateman did not show any signs of aggression towards anyone at the scene; however, Officer Krekel later falsely told his supervisor, Lieutenant Walker, that Matt Bateman was "amped up." Officer Scott-Lee's dash camera footage also shows that this was not true.

25.     To Sammie Anderson, Matt Bateman,  Grant Bible, and other civilian witnesses at the scene, Officer Scott-Lee and Krekel's tasers looked like guns because they were black in color and had laser sights that the officers were aiming at people to intimidate them.

26.     Sammie Anderson also got on the ground, as instructed.

**ORIGINAL COMPLAINT**

27.     Grant Bible put his hands in the air and stood still until Officer Scott-Lee ordered him to approach.

28.     Officer Krekel was standing several feet behind Officer Scott-Lee and facing towards Grant Bible when Officer Scott-Lee ordered Grant Bible to approach.

29.     Officer Scott-Lee's body camera recorded him telling Grant Bible, "Come here. You're good; just come over here—you're good . . .."

30.     Later, after tasing Grant Bible, Officer Krekel would falsely tell Lieutenant Walker, "That guy that was tased . . . he came out of that car and, uh, approached the situation himself," though, again, Officer Scott-Lee's dash camera footage and body camera footage shows that this was not true.

31.     After ordering him to approach, Officer Scott-Lee asked Grant Bible, "Is it just all y'all fighting?" Grant Bible pointed at Matt Batemen and said, "Just him. No one is fighting though." Sammie Anderson also told Officer Scott-Lee, "No one is fighting."

**II.      Defendants used excessive force against Sammie Anderson.**

32.     Upon returning home from work, Samuel Bible was shocked to see police cars outside his family's home.

33.     Officer Scott-Lee and Krekel's vehicles were blocking the roadway, which led Samuel Bible to believe he should park his vehicle behind the officers' cars.

34.     Assuming officers had been called to assist his family with an emergency, Samuel Bible feared for his family's safety and walked towards the scene to find out what happened.

35.     Samuel Bible was shocked and confused when Officers Scott-Lee and Krekel immediately began yelling at him to get on the ground at taser-point.

**ORIGINAL COMPLAINT**

36.     Nobody at the scene had spoken in a raised voice before Officers Scott-Lee and Krekel began yelling at Samuel Bible.

37.     Samuel Bible's girlfriend, Jayla Armstead, was nearby when Officers Scott-Lee and Krekel began yelling at Samuel Bible.

38.     Sammie Anderson, Matt Bateman,  Grant Bible, and Jayla Armstead believed the officers were threatening to kill Samuel Bible and began begging them not to shoot him.

39.     The officers did nothing to assure the family that there were not threatening Samuel Bible's life. Instead, they continued yelling and behaving aggressively despite the fact that no one showed any signs of aggression towards the officers.

40.     Stunned by the officers' aggression, Samuel Bible tried to calm them and asked them to, "Listen," but Officers Scott-Lee and Krekel continued to yell and threaten him, even after Samuel Bible complied by kneeling on the ground.

41.     Fearing that Officer Scott-Lee was about to shoot and kill Samuel Bible, Sammie Anderson walked towards him while pleading, "He is not resisting, sir, he's just scared."

42.     Sammie Anderson did not make physical contact with Officer Scott-Lee nor did she show any signs of aggression. Still, Officer Scott Lee screamed, "Will you get your ass back?!"

43.     Officer Krekel turned his back to Matt Bateman and Grant Bible, holstered his taser, grabbed Sammie Anderson from behind and tackled her to the ground, causing a visible injury to her left leg as evidenced by the fact that Lieutenant Walker later asked a "med unit" to examine the wound.

44.     Grant Bible and Samuel Bible stood up in shock after witnessing Officer Krekel slam their mother on the ground, but neither of them approached either of the officers.

**ORIGINAL COMPLAINT**

45.     Officer Krekel aggressively drew his taser and aimed it at Grant Bible, screaming at him to get back on the ground.

46.     Believing her son was being threatened with lethal force, Sammie Anderson stood in front of him and begged Officer Krekel, "Please don't shoot my son!"

47.     Officer Krekel, along with Officer Scott-Lee, continued yelling and issuing threats until everyone was lying face-down on the ground.

48.     After everyone was on the ground, Officer Scott-Lee falsely told other officers en route to the scene that the males at the scene were fighting. Specifically, his dash camera and body cameras record him stating over his radio, "Proceed once you get here we need to start hooking people up. The males first—they're all trying to fight each other."

49.     Again, Officer Scott-Lee's dash camera footage shows that this was not true. It shows that at the time Officer Scott-Lee falsely claimed the males were fighting, Sammie Anderson, Matt Bateman, Grant Bible, Samuel Bible, and Jayla Armstead were all lying down on the ground as instructed. Matt Bateman had not moved from the original position he took when first ordered to get on the ground.

50.     At no point during the encounter did Officer Scott-Lee witness anyone fighting.

**III.    Defendants used excessive force against Grant Bible.**

51.     Officer Ryan Money was the third officer to arrive, followed by Officers Larry Walker, Kendall McGill, and Courie Bryant.

52.     When Officers Money, Walker, McGill, and Bryant arrived, they immediately began handcuffing everyone without the requisite reasonable suspicion or probable cause necessary to detain or arrest them.

**ORIGINAL COMPLAINT**

53.     When Officers Money, Walker, McGill, and Bryant arrived, there was no indication that Plaintiffs were attempting to fight each other or resist Officers Scott-Lee or Krekel. Plaintiffs were lying face-down on the ground as instructed.

54.     Officers Money, Walker, McGill, and Bryant joined Officers Scott-Lee and Krekel in unlawfully detaining and arresting Plaintiffs without the requisite reasonable suspicion or probable cause necessary to do so.

55.     After Matt Bateman and Samuel Bible were handcuffed, the officers crowded around Grant Bible, blocking Officers Scott-Lee's dash camera from recording what happened next: Officer Krekel repeatedly tased Grant Bible with his taser while officers Scott-Lee, Money, Walker, McGill, and Bryant participated by holding him down, aggressively twisting his arms behind his back, and handcuffing him while one of the officers placed his knee behind Grant Bible's head and neck, driving his face into the concrete.

56.     Afterward, Lieutenant Walker claimed that Grant Bible was tased because, "He would not comply."

57.     Although five of the six officers at the scene (Scott-Lee, Krekel, Money, Walker, and Bryant) were wearing body cameras, none of them recorded Grant Bible being tased and assaulted.

58.     The only officer whose body camera was activated during the majority of the encounter was Officer Scott-Lee's, although his body camera did not record Grant Bible's tasing.

59.     Plaintiffs allege that officers intentionally disabled their body cameras or positioned them in a manner that prevented Grant Bible's abuse from being recorded. Plaintiff's also allege that Chief Costa's choice to support the Officers' conduct contradicts his public support of the use

of body camera and the importance of officers keeping the cameras running during confrontations with citizens.

60.     Chief Costa's support of the Officers despite their decision not to record Grant Bible being tased demonstrates that DeSoto has a policy of supporting officers' conduct even when they violate the law and written procedures.

**IV.     Defendant's unlawfully arrested Plaintiffs.**

61.     Jayla Armstead and Sammie Anderson were also handcuffed.

62.     While Sammie Anderson was lying face-down, the officer who handcuffed her drove his knee into her back and pinned her to the ground, injuring her shoulders.

63.     Jayla Armstead was similarly handcuffed.

64.     Sammie Anderson remained handcuffed for over half an hour.

65.     Jayla Armstead remained handcuffed for roughly twenty-five minutes.

66.     Both Sammie Anderson and Jayla Armstead remained handcuffed well after Matt Bateman, Grant Bible, and Samuel Bible were placed in separate patrol vehicles.

67.     Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant each participated in unlawfully detaining and arresting Matt Bateman, Grant Bible, and Samuel Bible.

68.     Additionally, Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant each participated in unlawfully detaining and arresting Sammie Anderson and Jayla Armstead.

69.     Although Sammie Anderson and Jayla Armstead were not taken to jail, like Matt Bateman, Grant Bible, and Samuel Bible, their detentions rose to the level of constituting arrests.

70.      Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant all participated in unlawfully detaining and arresting  Sammie Anderson and Jayla Armstead by forcing them to remain handcuffed and seated on the ground, restricting their movements, including by standing

over them as they remained seated on the hot pavement, refusing to remove or loosen their handcuffs when asked, questioning them, and refusing to allow them to stand despite the women providing valid reasons for requesting to do so.

71.     Sammie Anderson asked to stand because the pavement was too hot to sit on without experiencing pain.

72.     Sammie Anderson was forced to remain on the hot pavement for nearly twenty minutes until she told the officers that she suffers from seizures and that she feared continuing to sit on the pavement might cause her to have one.

73.     Jayla Armstead had a visible scar on her arm from a recent surgery. She complained that her handcuffs were causing her pain; however, officers refused to loosen or remove them until medical personnel asked them to.

**V.      Defendants' post-arrest comments support Plaintiffs' claims.**

74.     After Matt Bateman, Grant Bible, and Samuel Bible were placed in patrol cars, Lieutenant Walker identified himself as a lieutenant and supervisor to Sammie Anderson.

75.      He explained that the officers used force because Plaintiffs were "out of control;" however, Officer Scott-Lee's dash camera shows that Plaintiffs were all laying face-down on the ground, in compliance with Officer Scott-Lee and Krekel's instructions, when Lieutenant Walker arrived.

76.     Officer Scott-Lee began questioning family members with the assistance of Officers Money, Walker, McGill, and Bryant.

77.     Despite the fact that Officer Scott-Lee's investigation did not unearth the requisite reasonable suspicion or probable cause necessary to detain or arrest Plaintiffs, Officers Scott-Lee,

**ORIGINAL COMPLAINT**

Krekel, Money, Walker, McGill, and Bryant continued to participate in detaining and arresting Plaintiffs.

78.     In Lieutenant Walker's presence, Officer Scott-Lee asked Sammie Anderson to explain what happened before he arrived. Officer Scott-Lee interrupted her several times.

79.     For example, Lieutenant Walker's body camera footage captures Officer Scott-claiming that he pulled his taser on her, Matt Bateman, and Grant Bible because, "Y'all were in the street trying to fight" to which Lieutenant Walker added, "That's protocol."

80.     However, Officer Scott-Lee's dash-camera footage and body-camera footage show that he neither witnessed Plaintiffs fighting nor attempting to fight each other.

81.     Officer Scott-Lee also interrupted Sammie Anderson to explain that the situation became violent because Plaintiffs did not follow all of the instructions provided by officers at the scene. Specifically, he stated, "Me, as a peace officer—if you're not listening, you get what you get," and, "When the police show up, we're in control—do what you're told."

82.     When Sammie Anderson responded that Plaintiffs did follow the officers' instructions, Officers Scott-Lee, Krekel, Walker, and others repeated several times that all of the events that transpired were recorded by Officer Scott-Lees dash camera and by the body cameras worn by each of the officers at the scene.

83.     However, not one of the body cameras worn by Officers Scott-Lee, Krekel, Money Walker, or Bryant recorded the entire encounter and not one recorded any part of Grant Bible being tased.

84.     The situation ended with officers arresting Grant Bible, Samuel Bible, and Matt Bateman. Samuel and Grant Bible were arrested for interfering with the police officers. Matt Bateman was arrested on different charges.

**ORIGINAL COMPLAINT**

85.     The Dallas County District Attorney subsequently dismissed all charges against Grant Bible and Samuel Bible for lack of evidence of any criminal offense shortly after the cases were turned over to the District Attorney's office.

86.     Before concluding his conversation with Sammie Anderson, Lieutenant Walker spontaneously raised the issue of race, stating, "We're all racist officers, right? We're all racist officers, right? Is that why we did this?" Sammie Anderson had not accused Lieutenant Walker or any of the other officers of being racist. Though Officer Walker raised the issue sarcastically, his emphasis on race evidenced an awareness that race played a factor in the events that transpired on August 7, 2018, and is an ongoing issue with the DeSoto Police Department.

**VI.     The DeSoto Police Department has a self-reported history of racial profiling.**

87.     Desoto Police Department's Chief, Joe Costa, admits in two reports on racial profiling commissioned by the DeSoto Police Department that African-American motorists are detained at rates higher than non-African-American drivers in DeSoto.

88.     This self-reported racial profiling data supports the reasonable inference that African Americans are profiled by the DeSoto Police Department in other contexts, including detentions and arrests like Plaintiffs' in this case.

89.     Two of Chief Costa's recent Racial Profile Reports are publicly available. The first, dated March 8, 2017 (the "Current Report"), is featured on the City of DeSoto's website (a copy of the Current Report is attached as Exhibit "A.").[1] The second report is dated January 16, 2015 (the "Past Report") (a copy of the Past Report is attached as Exhibit "B").

---

[1] The Current Report can be found on the City of DeSoto's website by following this path from the homepage: Departments, Police, Divisions, Professional Standards, and Racial Profiling Report.

**ORIGINAL COMPLAINT**

90.    Not only do the reports show that African-American motorists are stopped more frequently than non-African-Americans, but the reports also show that African-Americans have been stopped at increasingly higher rates over time.

91.    In his Past Report, Chief Costa openly admitted, "It is reasonable to believe that African American [sic] motorists will be stopped in DeSoto more than any other race . . .."

92.    The Past Report specified that 74.9% of motor vehicle stops involved African Americans in 2014, which was higher than the percentage of African Americans then living in DeSoto.[2]

93.    Moreover, this disparity was only true for African-American motorists. It was not true for non-African-Americans. Caucasians and Hispanics were stopped at rates below their respective populations.

94.    In his Current Report, Chief Costa neither openly admits that African-American motorists are stopped in DeSoto more than any other race, nor does he specify what percentage of motor vehicle stops involve African Americans. However, the data included in his report shows that African-American motorists are stopped more often than non-African-Americans. Moreover, it shows that African-American motorists are stopped even more frequently than they were in the past despite the fact that their population has remained the same.[3]

95.    The Past Report shows that 74.9% of motor vehicle stops involved African Americans. The Current Report shows that 78.5% of motor vehicle stops involve African

---

[2] Out of an abundance of caution Plaintiffs note that it is difficult to analyze the data for Asian, Native-American, and Middle-Eastern populations because the report simply states that, together, they comprise less than 1% of all stops. However, it is reasonable to conclude that these groups were stopped at rates below their population percentages because the report specifies that DeSoto's population is 0.9% Asian and 0.5% Native American. No population percentage is provided for Middle-Eastern drivers.

[3] The Past Report relied on 2012 Census Data showing DeSoto's African-American population was 67.9%. The Current Report does not state DeSoto's African-American population percentage. However, the United States Census Bureau website states that African Americans currently comprise 68.3% of DeSoto's population.

**ORIGINAL COMPLAINT**

Americans. What remained constant between the Past Report and the Current Report is the fact that American-American motorists were the only demographic subjected to this disparity.[4]

96.     Chief Costa's self-reporting of racial profiling of African-American motorists, who are detained at higher rates than non-African-Americans, supports the reasonable inference that racial profiling also occurs when African Americans encounter DeSoto Police officers in other contexts, including detentions, arrests, and unlawful conduct like that experienced by Plaintiffs' on August 7, 2018.

97.     Chief Costa's Past Report was addressed to Mayor Carl O. Sherman and City Council Members Rachel Proctor, James Zander, Mayor Pro Tem Curtistene McCowan, Dick North, Virgil Helm, and Kristine Clark.

98.     Although his Current Report is not addressed to a specific audience, it is publicly available on the City of DeSoto's website.   Therefore, the Current Report was available to DeSoto's mayor and city council members and it is reasonable to infer that they are aware of it.

99.     Thus, on or about August 7, 2018, the City of DeSoto's final policymakers were aware of the ongoing problems with racial profiling by members of the DeSoto Police Department.

100.    Moreover, they were, and remain, consciously indifferent to the custom and practice of racial profiling resulting in African-American motorists being stopped by DeSoto police officers at rates higher than similarly situated non-African-Americans.

101.    Plaintiffs allege that this indifference constitutes a discriminatory custom and practice resulting in African-American motorists being detained at rates higher than non-African-Americans who were similarly situated.

---

[4] The Current Report does not provide population data. However, the United States Census Bureau website states that DeSoto's population is  12.4% Caucasian, 17.5% Hispanic, 0.5% Asian, and 0.1% Native American. No data is provided for Middle-Eastern residents.

**ORIGINAL COMPLAINT**

102.    Plaintiffs further allege that the persistent and widespread practice of racial profiling by the DeSoto Police Department is common and well established such as to constitute a custom that fairly represents the City of DeSoto's policies.

103.    Plaintiffs further allege that the City of DeSoto's discriminatory practice of racial profiling is attributable to DeSoto's city leadership because its mayor, city council members, and chief of police have actual or constructive knowledge of it.

104.    Therefore, the City of DeSoto is fairly and properly made a party to this lawsuit because the custom and/or practice of racial profiling by the DeSoto Police Department is for all intents and purposes the same as an officially adopted and promulgated policy of the City of DeSoto or it is a policy approved by Chief Costa to whom the City of DeSoto has delegated final policy-making authority.

105.    Plaintiffs also allege that the fact that this discriminatory custom and practice of the City of DeSoto's Police Department is identified in a report commissioned by the City of DeSoto itself is evidence that the practice is so well known and notorious that it can fairly be described as a policy ratified by the City of DeSoto's mayor, city council, and chief of police, and, therefore, can be attributed to the City of DeSoto's final policy-maker.

106.    Plaintiffs allege that they were unlawfully detained, arrested, and experienced other unlawful mistreatment on August 7, 2018, because of their African-American race and that similarly situated non-African-Americans would not have experienced the same mistreatment. These abuses were deprivations of their federal constitutional rights to equal protection under the law and to be free from unlawful searches and seizures. Moreover, Plaintiffs were unlawfully detained, arrested, and experienced other unlawful mistreatment on August 7, 2018, because of a discriminatory policy, practice and/or custom of the City of Desoto.

**ORIGINAL COMPLAINT**

**VII.   DeSoto's Chief of Police reviewed Defendant's actions and publicly stated that they followed DeSoto PD policies and did nothing wrong.**

107.     On or about October 1, 2018, the DeSoto Police Department released Officer Scott-Lee's dash camera footage arguing that the Officers Scott-Lee, Krekell, Money, Walker, McGill, and Bryant followed DeSoto Police Department policies and procedures and did nothing wrong.

108.     Prior to releasing the dash camera footage, DeSoto's Police Chief, Joe Costa, met with Sammie Anderson to review the footage with her in an attempt to convince her that Officers Scott-Lee, Krekell, Money, Walker, McGill, and Bryant followed DeSoto Police Department procedures and did nothing wrong.

109.     Chief Costa ended the meeting shortly after Sammie Anderson requested a copy of the video.

110.     Upon information and belief, Plaintiffs allege that Chief Costa publicly stated that Officers Scott-Lee, Krekell, Money, Walker, McGill, and Bryant followed DeSoto Police Department procedures and did nothing wrong before the DeSoto Police Department's Internal Affairs Division completed their investigation of the Defendant Officers' conduct.

111.     Upon information and belief, Plaintiffs allege that Chief Costa has publicly stated in interviews with the *Dallas Morning News* that DeSoto Police Department's policies require citizens to "comply now, complain later."

112.     Plaintiffs allege that the "comply now, complain later" policy encourages officers to believe they are entitled to issue unlawful commands and then force citizens to comply with those unlawful commands by whatever means they deem necessary.

113.     This includes: Officers Scott-Lee and Krekel ordering Sammie Anderson, Matt Bateman, Grant Bible, and Samuel Bible to get on the ground at taser-point despite the fact that they lacked the requisite reasonable suspicion to detain them; Officer Krekel tackling Sammie

Anderson to the ground causing injury to her left knee; Officer Krekel tasing Grant Bible while Officers Scott-Lee, Money, Walker, McGill, and Bryant participated by holding him down, aggressively twisted his arms behind his back, and one officer placed his knee on Grant Bible's neck while driving his face into the pavement; and Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant wrongfully arresting Grant Bible and Samuel Bible and wrongfully initiating prosecution against them for interfering with police.

114.    Upon information and belief, Plaintiffs allege that at least three of Defendant Officers were previously disciplined for violating DeSoto Police Department's policies.

115.    Upon information and belief, Plaintiffs allege that Chief Costa admitted to the *Dallas Morning News* during interviews about the events of August 7, 2018, that Officers Scott-Lee and Krekel faced discipline for problems occurring less than one year prior to August 7, 2018, but provided no details.

116.    Upon information and belief, Plaintiffs allege that Officer Money was reprimanded in mid-August of 2018 for ignoring a supervisor's orders to stop chasing a suspect, who eventually crashed his car into another vehicle, according to a police memo.

**VIII.   DeSoto's final policymakers held a town hall meeting to further support Defendants.**

117.    On Tuesday, October 16, 2018, DeSoto's Mayor, Curtistene McCowan, helped organize a town hall meeting attended by roughly sixty people to address what happened on August 7, 2018. Among those in attendance were several elected officials, including U.S. Rep. Eddie Bernice Johnson, Senator Royce West, District Attorney Faith Johnson, DeSoto city officials and, speaking on behalf of the DeSoto Police Department, in place of Chief Joe Costa, Sergeant Heath Penwarden, head of internal affairs.

**ORIGINAL COMPLAINT**

118.    Speaking on behalf of the DeSoto Police Department, Sergeant Penwarden further defended Officers Scott-Lee, Krekell, Money, Walker, McGill, and Bryant, claiming that their actions were consistent with DeSoto Police Department's policies.

## COUNT I

**Municipal Liability- Unconstitutional Custom or Policy- 42 U.S.C. § 1983**

119.    Plaintiffs reallege and incorporate by reference, as though fully set forth here, each and every allegation set forth in the above paragraphs.

120.    On and for some time prior to July 18, 2017 (and continuing to the present date) Defendants City of DeSoto, DeSoto Police Department, and Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant deprived Plaintiffs of their rights and liberties secured to them by the Fourth and Fourteenth Amendments to the United States Constitution, in that said Defendants and their supervising and managerial employees, agents, and representatives, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, knowingly maintained, enforced and applied an official policy recognized by the City of DeSoto and the DeSoto Police Department.

121.    Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant acted under color of law.

122.    Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant acted pursuant to an expressly adopted official policy or a longstanding practice or custom of the Defendant City of DeSoto.

123.    Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant were not terminated or suspended in connection with the offenses Plaintiffs allege they committed against them on August 7, 2018.

**ORIGINAL COMPLAINT**

124.   Defendant City of DeSoto together with the DeSoto Chief of Police, and other Policymakers, including DeSoto's mayor and DeSoto's city council members, maintained, inter alia, the following unconstitutional customs, practices, and policies:

a.   Racial profiling;

b.   Unlawful searches and seizures;

c.   Using excessive force;

d.   Providing inadequate training regarding the use of force;

e.   Providing inadequate training regarding the de-escalation of force;

f.   Providing inadequate training regarding the use of body cameras;

g.   Employing and retaining as law enforcement officers those who Defendant City of DeSoto, at all times material herein, knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens through unlawful searches, unlawful seizures, assaults, and excessive uses of force;

h.   Inadequately supervising, training, controlling, assigning and disciplining law enforcement officers who Defendant City of DeSoto, knew, or in the exercise of reasonable care, should have known had the aforementioned propensities and character traits;

i.   Employing and retaining officers who have been known to be abusive;

j.   Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling the intentional misconduct by those who are law enforcement officers.

**ORIGINAL COMPLAINT**

k.  Failing to adequately discipline law enforcement officers for the above-referenced categories of misconduct by administering discipline that is so slight that is tantamount to encouraging misconduct;

l.  Having and maintaining an unconstitutional custom and practice of using excessive force and covering up police misconduct. These customs and practices were condoned by Defendants in deliberate indifference to the safety and rights of civilians, including the Plaintiff.

125.    By reason of the aforementioned policies and practices of Defendant City of DeSoto and their Policymakers, Plaintiffs experienced severe pain and suffering for which they are entitled to recover damages. The aforementioned acts and omissions also caused Plaintiffs' pain and suffering.

126.    Defendants City of DeSoto, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above, these Defendants condoned, tolerated and, through actions and inactions, ratified such policies. Said Defendants also acted with deliberate indifference to both the foreseeable effects and consequences of these policies and to the constitutional rights of Plaintiffs, and other individuals similarly situated.

127.    By perpetuating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendant City of DeSoto acted with an intentional, reckless, and callous disregard for the well-being of Plaintiffs and their constitutional and human rights. Defendant's actions were willful, wanton, malicious, fraudulent, and extremely offensive and unconscionable to a reasonable person.

**ORIGINAL COMPLAINT**

128.     Furthermore, the policies, practices, and customs implemented, maintained and still tolerated by Defendant City of DeSoto and DeSoto Police Department were affirmatively linked to, and were a significantly influential force behind, the Plaintiffs' injuries.

129.     Plaintiffs bring this claim and seek damages for the nature and extent of their injuries, pain and suffering, and emotional distress. Plaintiffs also seek attorneys' fees.

## COUNT II

### Municipal Liability – Failure to Train – 42 U.S.C. § 1983

130.     Plaintiffs reallege and incorporate by reference, as though fully set forth herein, each and every allegation set forth in the above paragraphs.

131.     Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant acted under color of law.

132.     The acts of Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant deprived Plaintiffs of their particular rights under the United States Constitution.

133.     On information and belief, the DeSoto Police Department failed to properly and adequately train Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant, including but not limited to, with regard to the use of physical force, making arrests, use of force against restrained citizens, and de-escalation tactics and principles.

134.     Defendants City of DeSoto and DeSoto Police Department developed and maintained a policy of deficient training of its law enforcement officers in the use of force, including excessive force, apprehension of individuals, and use of force against non-threatening persons. The DeSoto Police Department's training is designed and implemented by Chief Costa and the DeSoto Police Department to instruct its law enforcement officers to act in this regard.

ORIGINAL COMPLAINT

135.     Plaintiffs will show that Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the City of DeSoto, the DeSoto Police Department, and Chief Costa knew or should have known would occur because the officers did not receive requisite and proper training.

136.     The training policies of Defendants City of DeSoto and DeSoto Police Department were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including the use of force and with regard to the treatment of individuals being detained or arrested.

137.     Defendants City of DeSoto and DeSoto Police Department were deliberately indifferent to the obvious consequences of their failure to train their officers adequately.

138.     The failure of Defendants City of DeSoto and DeSoto Police Department to provide adequate training caused the deprivation of Plaintiffs' rights by Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant; that is, Defendants City of DeSoto and DeSoto Police Department's failure to train is so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused the ultimate injury.

139.     The aforementioned acts and omissions caused Plaintiffs' injuries and pain and suffering.

140.     Accordingly, Defendants are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

141.     Plaintiffs bring this claim and seek damages for the nature and extent of their injuries, pain and suffering, and emotional distress. Plaintiffs also seek attorneys' fees.

**ORIGINAL COMPLAINT**

## COUNT III

### Unlawful Seizure of a Person – 42 U.S.C. § 1983

142.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, each and every allegation set forth in the above paragraphs.

143.    Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant acted under color of law.

144.    DeSoto Police Officers, including Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant, unlawfully detained Plaintiffs without probable cause, or reasonable suspicion that any violation or crime had been committed. Those actions violated Plaintiffs' rights to due process, equal protection, and give rise to Plaintiffs' claims pursuant to the Fourth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

145.    The City of DeSoto and the DeSoto Police Department violated Plaintiffs' constitutional rights to due process, equal protection, and not to be detained without probable cause or reasonable suspicion when the Defendants arrested and wrongfully detained Plaintiffs. Plaintiffs were detained, placed in handcuffs and arrested, despite the fact that there was no reasonable basis for suspecting that they had been involved, were involved, or were about to be involved in criminal activity and despite the fact that there was no probable cause to arrest them. When Officers Scott-Lee and Krekel stopped Sammie Anderson she was simply walking near her home, Grant Bible was seated in his car, and Samuel Bible was attempting to return to his home after work.

146.    Plaintiffs did not pose an immediate threat to the safety of law enforcement officers or others. Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant's conduct was objectively unreasonable, resulted from a lack of training, and comported with the City of DeSoto and DeSoto Police Department's illegal de facto policies.

**ORIGINAL COMPLAINT**

147.    As a result, Plaintiffs suffered injuries, which resulted directly from their wrongful detention, and/or seizure that was objectively unreasonable and violation of clearly established law.

## COUNT IV

**Excessive Force (Individually and in his Official Capacity) – 42 U.S.C. § 1983**

148.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, each and every allegation set forth in the above paragraphs. Plaintiffs would show that the Defendant Officers' actions on the occasion in question were wrongful, malicious and reckless in depriving Plaintiffs of their constitutional rights, as alleged more fully below.

149.    Plaintiffs would show that at all times material hereto, the Defendants had a duty to avoid infliction of unjustified bodily injury to Plaintiffs, to protect their bodily integrity, and to not trample on their constitutional rights.

150.    This cause of action is brought pursuant to 42 U.S.C.A. § 1983 and the United States Constitution.

151.    On August 7, 2018, Plaintiffs possessed the rights guaranteed by the United States Constitution, included but not limited to, the Fourth and Fourteenth Amendment rights against unlawful and unreasonable search, seizure, excessive force, and equal protection under the law.

152.    Plaintiffs would show that Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant failed to act as reasonable officers would have acted in the same or similar circumstances. That is, the officers, without justification and the need to do so, used excessive force as described above and severely injured Plaintiffs Sammie Anderson and Grant Bible without legal justification. Sammie Anderson and Grant Bible did not make any threatening gestures towards Defendant Officers Scott-Lee, Krekel, Money, Walker, McGill, and Bryant or other law

enforcement and did not pose an immediate threat to the safety of Scott-Lee, Krekel, Money, Walker, McGill, and Bryant or other officers on the scene.

153.    Defendant Scott-Lee, Krekel, Money, Walker, McGill, and Bryant and other officers on the scene were not provoked when they began violently assaulting Sammie Anderson and Grant Bible for no lawful or justifiable reason.

154.    The unjustified and excessive force used by Scott-Lee, Krekel, Money, Walker, McGill, and Bryant was not reasonable, nor was it necessary under the circumstances. When Officer Krekel tackled Sammie Anderson to the ground, she neither posed a threat to him or Scott-Lee who were the only officers then at the scene. Moreover, neither officer had a legal basis for detaining or arresting her.  When Officer Krekel tased Grant Bible while Officers Scott-Lee, Money, Walker, McGill, and Bryant participated by holding him down, aggressively twisting his arms behind his back, and one officer placed his knee on Grant Bible's neck while driving his face into the pavement, he was lying face down on the ground with several officers bearing their weight on his back. Moreover, none of the officers had a legal basis for detaining or arresting him.

155.    Defendants Scott-Lee, Krekel, Money, Walker, McGill, and Bryant's actions on that day were not objectively reasonable because they were designed to inflict excessive force in restraining an individual in a non-threatening situation that included several surrounding law enforcement officers.

156.    The Plaintiffs would show that the Defendant denied Plaintiffs their right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution.

157.    The force used by Defendants Scott-Lee, Krekel, Money, Walker, McGill, and Bryant and other law enforcement was unnecessary, excessive and unreasonable under the

**ORIGINAL COMPLAINT**

circumstances, as neither Sammie Anderson nor Grant Bible posed an immediate threat to the safety of Scott-Lee, Krekel, Money, Walker, McGill, or Bryant. Because there was no threat to law enforcement, the assaults on Sammie Anderson and Grant Bible were excessive and none of the violent attacks were necessary under the circumstances. The Defendants embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact, did cause Plaintiffs to suffer extreme and severe mental and emotional distress, agony, anxiety and physical harm.

158.    As a result of the conduct by Defendants Scott-Lee, Krekel, Money, Walker, McGill, and Bryant, Defendants are liable to plaintiffs for their injuries, either because they were integral participants in the use of excessive force or because they failed to intervene to prevent these violations.

159.    The conduct of Defendants Scott-Lee, Krekel, Money, Walker, McGill, and Bryant was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights and safety of Plaintiffs and therefore warrants the imposition of exemplary and punitive damages. Sammie Anderson and Grant Bible suffered painful and brutal attacks. Sammie Anderson's left knee was injured when Officer Krekel tackled her to the ground. Grant Bible experienced excruciating pain when he was tased repeatedly by Officer Krekel while officers Scott-Lee, Money, Walker, McGill, and Bryant assisted in holding him down. In addition to the physical pain he suffered, Grant Bible's left eye was injured.

160.    Accordingly, Defendants are liable to Plaintiffs for compensatory and punitive damages under 42 U.S.C.A. § 1983. Plaintiffs seek damages for the nature and extent of Plaintiffs' injuries, pain and suffering, and emotional distress. Plaintiffs also seek attorneys' fees.

**ORIGINAL COMPLAINT**

161.    As a result of these constitutional violations to Plaintiffs and the injuries they sustained, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## DAMAGES

162.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, each and every allegation set forth in the above paragraphs.

163.    As a direct and proximate result of the Defendants' acts and/or omissions alleged herein, Plaintiffs suffered:

  a.  Actual damages;

  b.  Pain and suffering;

  c.  Mental anguish and emotional distress suffered by Plaintiffs;

  d.  Medical expenses;

  e.  Pre- and post-judgment interest;

  f.  Attorneys' fees and costs of suit; and

  g.  Such other and further relief as this Honorable Court deems just and proper.

## PUNITIVE/EXEMPLARY DAMAGES

164.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, each and every allegation set forth in the above paragraphs.

165.    Additionally, and in the alternative, the conduct of Defendants Scott-Lee, Krekel, Money, Walker, McGill, and Bryant was done with malice. As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future. Such unconscionable conduct goes beyond ordinary negligence as it was done intentionally and for the purpose of causing Plaintiffs harm. Plaintiffs request punitive and exemplary damages be awarded against Defendants

Scott-Lee, Krekel, Money, Walker, McGill, and Bryant in a sum which is within the jurisdictional limits of this Court.

## COSTS AND ATTORNEYS' FEES

166.    Plaintiffs reallege and incorporate by reference, as though fully set forth here, each and every allegation set forth in the above paragraphs.

167.    Plaintiffs are entitled to an award of attorney fees and costs under 42 U.S.C.A. § 1988(b). As such, Plaintiffs request the Court to award costs and attorneys' fees incurred in Plaintiffs' prosecution of this litigation.

## CONDITIONS PRECEDENT

168.    Plaintiffs reserve their rights to plead and prove the damages to which they are entitled to at the time of trial. All conditions to Plaintiffs' recovery have been performed or have occurred.

## TRIAL BY JURY

169.    Plaintiffs have paid a jury fee and demand a trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Plaintiff further demands that he be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

**ORIGINAL COMPLAINT**

Dated: February 24, 2020                    Respectfully submitted,


                                            */s/ David W. Henderson*
                                            David W. Henderson
                                            Texas State Bar No. 24032292
                                            dhenderson@equalrights.law
                                            Jay D. Ellwanger
                                            Texas State Bar No. 24036522
                                            jellwanger@equalrights.law
                                            Ellwanger Law LLLP
                                            400 S. Zang Blvd. Ste. 1015
                                            Dallas, TX 75208
                                            Telephone: (469) 998-6775
                                            Facsimile:  (469) 998-6775

                                            **Counsel for Plaintiffs**


**ORIGINAL COMPLAINT**